IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **MISTI ORR,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-1592-K (BH) |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b)(1)(B), and Special Order No. 3-251, the District Court referred this case for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment* ("Pl. Mot.") with brief in support ("Pl. Br."), filed March 3, 2009 (docket #14) and *Commissioner's Motion for Summary Judgment* ("Def. Mot.") with brief in support ("Def. Br."), filed May 15, 2009 (docket #19). Based on the filings and applicable law, the Court recommends that *Plaintiff's Motion for Summary Judgment* be **GRANTED**, the *Commissioner's Motion for Summary Judgment* be **DENIED**, and the case be remanded to the Commissioner for further proceedings.

### I. BACKGROUND[1]

**A. Procedural History**

Misti Leigh Orr ("Plaintiff") seeks judicial review of a final decision by the Commissioner

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the Social Security Act. On January 26, 2007, Plaintiff filed an application for disability insurance benefits ("DIB"). Plaintiff claimed she had been disabled since December 31, 2004, due to headaches and vision problems. (Tr. at 69). Her application was denied initially and upon reconsideration on July 19, 2007. (Tr. at 28). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 78). Plaintiff personally appeared and testified at a hearing held on January 28, 2008, in Dallas, Texas. (Tr. at 28, 41-42). On February 22, 2008, the ALJ issued his decision finding the Plaintiff not disabled. (Tr. at 28-40). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 1-3). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 1). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B. Factual History**

    **1. Age, Work Experience, & Education**

Plaintiff was born in 1965 and was 42 years old at the time of the ALJ's decision. (Tr. at 113). She has two bachelor's degrees. (Tr. at 45). Her past work experience includes work as an engineer for Boeing Commercial Aircraft and Dell. (Tr. at 46). Her last full-time employment, which ended in May 2001, was as a mechanical design engineer for Dell. (Tr. at 45).

    **2. Medical Evidence**[2]

On March 1, 1991, Plaintiff reported to her ophthalmologist, Dr. Jeff Arnoult, that she

---

[2] This summary of Plaintiff's medical history begins before the disability period. Because the diagnosis of migraine headaches is rarely shown through objective medical tests, a background of Plaintiff's past migraine history is useful for evaluating her current claims. (*See* Dr. Bringewald's report, Tr. at 335).

experienced eye spasms after studying or performing near work. (Tr. at 216, 267). Dr. Arnoult diagnosed her with dry eyes. (Tr. at 267). On October 26, 1993, Plaintiff told Dr. Arnoult that she had daily headaches while reading. (Tr. at 222). Subsequent ocular motility testing showed a reduction of her fusional amplitudes for convergence, a condition which causes eye discomfort and headaches after prolonged reading. (Tr. at 267). Dr. Arnoult performed similar ocular motility tests almost a year later on September 14, 1994, and again found evidence of convergent weakness. (Tr. at 225-27, 267).

On August 24, 1999, Plaintiff reported to Dr. Arnoult that she suffered from migraine headaches that caused nausea and vomiting. (Tr. at 237, 267). Plaintiff's eyes were found to be accommodating more than necessary to see through corrective lenses. Dr. Arnoult diagnosed Plaintiff with accommodative spasm, a condition associated with headaches. (Tr. at 267). To minimize the headaches and spasms, Dr. Arnoult prescribed eye drops and advised Plaintiff to wear glasses instead of contact lenses. *Id*. These remedial measures had little positive effect. *Id*.

On August 31, 1999, Plaintiff sought the opinion of Dr. Douglas Hudson, a neurologist at that Austin Neurological Clinic. (Tr. at 360-61). Plaintiff had a severe headache, initially accompanied by nausea and vomiting, which had lasted for the two weeks leading up the visit. (Tr. at 360). Plaintiff had not been able to work for two weeks due to the pain. *Id*. Dr. Hudson noted that Plaintiff was very photophobic and had not responded to over-the-counter medication. *Id*. He prescribed Vicodin for the pain and gave her samples of Maxalt on a trial basis. (Tr. at 361).

Because of the link between accommodative spasms and the use of corrective lenses, Dr. Arnoult and Plaintiff opted to perform Lasik surgery to correct her vision. (Tr. at 241, 267). Dr. Arnoult performed the procedure on October 20, 1999. *Id*. Despite correcting her myopia, the Lasik

failed to cure Plaintiff's accommodative excess and headaches. (Tr. at 267).

Plaintiff then consulted Dr. Sue Ellen Young, an ophthalmologist, on April 2, 2001. (Tr. at 267). Dr. Young noted Plaintiff's migraines and other symptoms and affirmed the findings of convergence insufficiency. *Id.* Dr. Young suggested various eye exercises to help with her convergence issues. *Id.* On a follow-up visit on April 24, 2001, Plaintiff reported that the exercises increased her headaches. *Id.* Dr. Young advised Plaintiff to wear a visor while working to protect her from the overhead fluorescent lights and to modify her computer monitor to lessen glare. *Id.* Dr. Young also referred Plaintiff to Dr. Ninan Matthew, a migraine specialist from the Houston Headache Clinic. *Id.*

From June 13 to June 20, 2001, Plaintiff underwent intensive headache treatment under the care of Dr. Matthew. (Tr. at 315-17). However, her migraines still persisted. (Tr. at 267). In his discharge summary, Dr. Ninan wrote, "The headaches are predominantly temporal, frontal, and retro-orbital. Associated symptoms include nausea, photophobic and photophobic. Most recently her headaches had been nonresponsive to daily Maxalt." (Tr. at 317). His diagnosis at discharge was "1. Intractable migraine, 2. Phlebitis,[3] [and] 3. Visual discomfort." *Id.* Dr. Matthew recommended a variety or medications to Plaintiff, but due to adverse physical reactions to the prescribed drugs, Plaintiff stopped taking the medications and chose not to follow up with Dr. Matthew. (Tr. at 267).

Plaintiff returned to the Austin Neurological Clinic on September 26, 2001, this time seeing Dr. Michal A. Douglas, a neurologist. (Tr. 357-59). In a series of visits ending on February 20, 2002, Dr. Douglas found no neurological link to her migraines and had little success in prescribing

---

[3] Phlebitis is the inflammation of a vein. Dorland's Illustrated Medical Dictionary, (28 ed. 1994).

any new effective medications. (Tr. at 353-59). Plaintiff reported to Dr. Douglas that Maxalt, which she had first been prescribed by Dr. Hudson in 1999 (Tr. at 361), did have a positive effect on her headaches. (Tr. At 353, 355, 357). However, Plaintiff still had trouble with headaches when she tried to focus her eyes, regardless of medication. (Tr. at 55). Plaintiff also mentioned that she had undergone unsuccessful Botox treatment for her migraines. (Tr. at 359).

On July 30, 2002, Plaintiff again visited Dr. Young. (Tr. at 268). Re-evaluation found no improvement in her migraines, which Dr. Young again found to be triggered by reading and "with certain lights." *Id*.

On July 22, 2003, Plaintiff saw Dr. Peter Bringewald, a neuro-ophthamologist. (Tr. at 334-36). Plaintiff complained of migraine symptoms when performing visual tasks such as reading or watching television. (Tr. at 334). Dr. Bringewald found no positive results from his neuro-ophthamologic examination, but his impression concerning the Plaintiff noted, "[b]y history, migraine and migraine phenomena." (Tr. at 335). He found that "[t]here are no objective findings to support the claimant's subjective symptoms, but that is virtually always the case in patients who have migraine-related phenomena and problems. My diagnosis is that her symptoms are clearly related to migraine phenomenology." *Id*. He further noted that although Plaintiff could be capable of some remunerative activity, "knowing how severely some patients are affected by these migraine type symptoms, her activity definitely would be significantly curtailed in terms of time." (Tr. at 335). Dr. Bringewald recommended Plaintiff use relaxation techniques such as yoga to help control her headaches and prescribed no new medication. (Tr. at 335-36). He also stated that he found migraines "precipitated by visual tasks and light, particularly flickering light like a CRT of fluorescent light," to be very a common malady. *Id*.

On October 13, 2004, Plaintiff had a follow-up with Dr. Young. (Tr. at 268). Her convergence improved somewhat and she claimed that chiropractic treatment had helped to a degree, but she still reported migraine headaches. *Id*.

In October 2004, Plaintiff visited an alternative medicine specialist, Ron Manzanero, M.D. (Tr. at 256). Urine tests showed Plaintiff had "very elevated" levels of mercury. *Id*.

On January 6, 2005, Plaintiff visited Dr. Marci Roy, at the Austin Headache Clinic. (Tr. at 572-74). Dr. Roy stated, "[Plaintiff] has a severe headache four days per month and a mild headache twenty days per month…. There is a pulsating quality associated with the pain, and there is nausea, tinnitus, photophobic, and sonophobia, and worsening of the headache with eye strain." (Tr. at 572). Dr. Roy also mentioned, "[D]uring the headaches she must lie down." *Id*. Dr. Roy recommended prophylactic and abortive treatment for migraines and suggested that Plaintiff seek further medical evaluation concerning possible mercury toxicity. (Tr. at 574).

In a March 22, 2006, letter to the Disability Examiner, Dr. Young stated, "I am convinced that [Plaintiff] cannot engage in computer usage more than two hours at best at a time on 'good days'. She is incapable of working on a computer more than this." (Tr. at 268). Dr. Young also reported some improvement in Plaintiff's convergence and mentioned the possibility of mercury toxicity as a factor in her illness. *Id*.

**3. Hearing Testimony**

A hearing was held before the ALJ on January 28, 2008. (Tr. at 43). Plaintiff, her attorney, a medical expert, and a vocational expert attended the hearing. *Id*.

*a. Plaintiff's Testimony*

Plaintiff testified the she was 42 years old, weighed 165 pounds, and was five feet and five

inches tall. (Tr. at 45). She had no vision limitation on her driver's license but only drove during midday because headlights aggravated her light-sensitive eyes. *Id*. She had earned two bachelor's degrees, one in animal science and the other in mechanical engineering, and had graduated in 1996. (Tr. at 45-46). Plaintiff worked for Boeing for a year and a half, and her last job as a Dell engineer ended in May 2001. (Tr. at 45-46). A few weeks before the hearing Plaintiff started working as a part-time high school tutor. (Tr. at 46). As a tutor, Plaintiff worked for a total of four hours per week, spread over Tuesday and Thursday, with an hour break after every hour of work. *Id*. This was her only employment since leaving Dell in 2001.

Concerning her ailments, Plaintiff testified that she had severe light sensitivity, which caused eye twitching and pain she identified as being similar to migraine headaches. (Tr. at 47). She had sought many different kinds of unsuccessful treatment from 2001 to 2003. *Id*. Plaintiff developed various muscle ailments during that period, her headaches became very serious and triggered by any attempt to read, and she mostly had to spend her time in dark rooms (Tr. at 47-48). She could not drive or look at a computer screen for more than twenty minutes at a time between 2001 and 2003 because the eye strain would cause serious headaches. (T r. at 48).

Plaintiff explained that chiropractic treatments starting in 2003 began to somewhat alleviate her ailments. (Tr. at 47-48). She attested to being diagnosed with mercury poisoning in late 2004 by Ron Manzanero, M.D., an alternative medicine practitioner. (Tr. at 48). Non-FDA approved treatment under Dr. Manzanero had helped remove some of the mercury from Plaintiff's system, improving her condition to a degree. (Tr. at 48-49). Additionally, Dr. Sconyers, had been performing similar mercury treatment for the six months before the hearing. (Tr. at 49). After the treatment, Plaintiff was able to be under fluorescent lights for up to three hours at a time and could

look at a computer screen for about an hour on an average day. *Id*.

Under questioning from her attorney, Plaintiff testified to having memory problems before January 2005. (Tr. at 52). Migraines would make her unable to think, would last for weeks, and would always be accompanied by nausea and vomiting. (Tr. at 52-53). Acid reflux also accompanied the rest of her symptoms. (Tr. at 53). Plaintiff handled mercury during a short time she spent in dental school. (Tr. at 54). She also attributed weight-gain of about fifteen pounds each year after 2001 to mercury in her system. (Tr. at 56).

When questioned by the ALJ, Plaintiff testified that she was able to wash herself, dress herself, and take care of her other personal needs. (Tr. at 57). She was not taking any medication for mental health issues, and she had never had any notable problems with co-workers or supervisors. (Tr. at 57-58)

### b. *Medical Expert Testimony*

The Commissioner's medical expert ("ME"), Dr. Charles Murphy, testified about Plaintiff's impairments and their severity. He found a diagnosis of convergent weakness, migraine headaches, and accommodative spasms. (Tr. at 58). Plaintiff had a history of dry eyes, and her accommodative spasms were mainly associated with near vision. *Id*. Plaintiff frequently complained of photosensitivity, and her migraines were determined to be "of a visual disturbance." (Tr. at 59). The ME highlighted Plaintiff's relative decrease in headaches after chiropractic treatment in late 2004. *Id*. He emphasized that other than one test by alternative physician Ron Manzanero, M.D., no lab work showed traces of mercury in Plaintiff's system. (Tr. at 59-60).

Concerning Plaintiff's residual functional capacity ("RFC"), the ME stated that Plaintiff needed to avoid bright lights, specifically fluorescent lights, and could perform no more than two

hours of computer use per day. (Tr. at 60). He found no exertional limitations. *Id*. On the issue of frequent headache-related absences, he said, "I can't really comment on that. I don't know." *Id*.

During questioning by Plaintiff's attorney, the ME explained that migraines could affect one's ability to concentrate and focus, depending on the severity of the migraines. (Tr. at 61).

### c. *Vocational Expert Testimony*

The vocational expert ("VE") classified Plaintiff's past relevant work as an engineer as skill level 8 with a sedentary exertional level. (Tr. at 62-63). The ALJ asked the VE whether Plaintiff would be able to perform her past work if she were limited to only using a computer for a maximum of two hours a day and had to avoid bright fluorescent lights. (Tr. at 63). The VE replied that Plaintiff would not. *Id*. The VE stated that a hypothetical person with the same age, education, experience, and residual functional capacity as Plaintiff would be able to perform jobs in the national economy. *Id*. The VE offered examples of such jobs: a cutter and paster, a house sitter, and a tube operator. *Id*. In response to questioning by the ALJ, the VE stated that, in addition to the facts of the hypothetical, if Plaintiff required one to two unscheduled absences per month, she would not be competitive in the national economy. (Tr. at 64).

The VE held that a person under the same hypothetical would not be competitive in the national economy if that person had frequent, extended limitations in her ability to concentrate, be punctual, adhere to a schedule, or perform without needing extended rest periods. (Tr. at 65).

## C. **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on February 22, 2008. (Tr. at 28-40). Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of December 31, 2004. (Tr. at 30, ¶2). Convergent insufficiency was Plaintiff's

one severe impairment. (Tr. at 30, ¶3). The ALJ mentioned several diagnoses of accommodative spasms, photophobic, dry eyes, and migraine headaches, but he did not list these as severe impairments. (Tr. at 31-32, ¶3). Plaintiff had no additional physical or mental impairments, and Plaintiff's severe impairment did not meet or equal a listed impairment as of her disability date. (Tr. at 34, ¶¶3, 4).

Plaintiff's RFC had no exertional limitations, but Plaintiff would be limited to jobs which required less than two hours of computer use at a time in an 8 hour day and no bright fluorescent lights. (Tr. at 34, ¶5). The ALJ gave Dr. Young's medical opinion great weight in his judgment and mentioned that the ME also accepted Dr. Young's findings. (Tr. at 37, ¶5).

The ALJ concluded that Plaintiff could not perform any past relevant work. (Tr. at 38, ¶6). However, Plaintiff would be able to make a vocational adjustment to jobs existing in sufficient numbers in the national economy. (Tr. at 39, ¶10). Accordingly, Plaintiff was not under a disability, as defined in the Social Security Act, at any time through the date of the decision. (Tr. at 39, ¶11).

## II. ANALYSIS

### A. Legal Standard

#### 1. Standard Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,


564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B. **Issues for Review**

Plaintiff presents the following issues for review:

1. Does the absence of migraine headaches from the ALJ's finding identifying Ms. Orr's medically determinable impairments justify reversal?

2. Given that the Decision states that Ms. Orr's account of her symptoms and limitations is "sincere" and "genuine," is not the result of any mental illness, and establishes disability if her credibly were favorably assessed – did the ALJ reversibly err by finding Ms. Orr "not credible" on the sole basis that her symptoms of eye pain and debilitating headache pain cannot be reasonably accounted for by any of her medically determinable impairment(s)?

3. Did the ALJ violate the rule of *Myers v. Apfel* and SSR 96-8p by sending Ms. Orr off to do three jobs that require frequent use of "near [visual] acuity," without first assessing her "near vision" function in a judicially reviewable way and, at the same time, assessing no restrictions on her ability to read or do other close work? Alternatively, does substantial evidence invalidate the ALJ's finding that Ms. Orr has no limitations in her ability to read or do other close work?

4. Did the ALJ properly assess Plaintiff's ability to do full-time work "on a regular and continuing basis," meaning "8 hours a day, for five days a week, or an equivalent work schedule," as SSR 96-8p and *Myers* require? Alternatively, is the ALJ's implied finding that she can do this supported by substantial evidence, given that the RFC finding does not require that she be permitted to use her medically prescribed visor at work, does not limit her driving to mid-day hours, does not allow her breaks in which to apply "artificial tears" to treat dry eyes, and allows for no time off to address an impending migraine?

5. Did the ALJ follow proper legal standards in rejecting (in whole or in part) the medical opinions of neuro-ophthalmologist Peter Bringewald, ophthalmologist Sue Ellen Young, neurologist Marci A. Roy, and other treating and examining doctors?

(Pl. Br. at 7-8).

C. **Issue One: Severe Impairment**

Plaintiff first contends that the ALJ failed to find that her migraine headaches were among her severe medically determinable impairments. It is not apparent from Plaintiff's motion whether

- 13 -

she argues the ALJ erred at step 2 or at the RFC determination that occurs prior to step 4. The Commissioner's motion concedes that the ALJ did not find Plaintiff's migraines to be a severe impairment at step 2. (Def. Br. at 4). The Court therefore considers whether substantial evidence supports the ALJ's decision not to include migraine headaches as a severe impairment at step 2.

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099,1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id.* at 1104. To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." *Id.* at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at *6 (N.D. Tex. Aug. 29, 2001) (Boyle, J.). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of

- 14 -

severity is used, the claim must be remanded to the Secretary for reconsideration. *Stone*, 752 F.2d at 1106.[4]

In this case, several doctors diagnosed Plaintiff's migraine headaches. For example, on July 22, 2003, Dr. Bringewald diagnosed Plaintiff's symptoms as being "clearly related to migraine phenomenology." (Tr. at 335). On January 6, 2005, Dr. Roy recorded that Plaintiff suffered from severe headaches four days each month and mild headaches twenty days each month. (Tr. at 572). Likewise, on March 22, 2006, Dr. Young affirmed her previous diagnosis of Plaintiff's migraine headaches. (Tr. at 267-68).

The ALJ acknowledged Plaintiff's medically diagnosed migraines several times within his step 2 analysis (Tr. at 30-32, ¶3). However, the ALJ did not evaluate how this impairment impacted Plaintiff's ability to do basic work activities, nor did he otherwise attempt to analyze Plaintiff's migraines according to the *Stone* standard for severe impairment.[5] His findings made no mention of how unscheduled absences or a frequent need to lie down due to headaches could impact Plaintiff's ability to do basic work activities. The Court cannot speculate how the workplace might accommodate Plaintiff's diagnosed medical impairment of migraine headaches; it can only scrutinize the record for substantial evidence and determine whether the Commissioner applied the

---

[4] The Court notes that the ALJ did not correctly apply the *Stone* standard. (*See* Tr. at 29, 30). Plaintiff briefly cites the ALJ's incorrect application of *Stone,* (Pl. Br. at 25), but did not present this issue as an error for review.

[5] The ALJ stated in the heading introducing his step 2 determinations that Plaintiff's only severe impairment was visual convergent insufficiency. (Tr. at 30, ¶3). However, throughout his step 2 analysis, he mentioned Plaintiff's migraines, light sensitivity and photophobic, accommodative spasms, and dry eyes (Tr. at 30-32, ¶3). The ALJ never questioned the medical validity of these diagnoses. In concluding his step 2 findings, he said, "[Plaintiff's] physical impairments are severe impairments." (Tr. at 34, ¶3). The ALJ's findings were inconsistent in whether he found a singular "impairment" or plural "impairments." It is possible that he found only the impairment of convergent insufficiency and saw the other conditions as its symptoms. However, the record does not show, and Court lacks the medical knowledge to decide, whether Plaintiff's other medical conditions could feasibly be symptoms of visual convergent insufficiency. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003). This, along with the ALJ's confusing word choice, renders the ALJ's holding at step 2 unreviewable.

proper legal standards. *Greenspan*, 38 F.3d at 236. Considering the medical evidence from Drs. Bringewald, Roy, and Young that suggests a limited ability to perform gainful activity, the Court finds a lack of substantial evidence to support the ALJ's decision that Plaintiff's migraines were not a severe impairment within the meaning of the Social Security regulations. *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 236.

The Commissioner did not raise any argument applicable to step 2. H asserts that the ALJ's RFC finding incorporated every limitation that Plaintiff's migraines require, and that the omission of migraines was therefore harmless error because Plaintiff's substantial rights were unaffected. (Def. Mot. at 5) (citing *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)). This objection concerns the RFC, which the ALJ assesses before proceeding from step 3 to step 4. 20 C.F.R. § 404.1520(a)(4). It is not pertinent to whether the ALJ's decision at step 2 is supported by substantial evidence. Furthermore, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Reviewing courts do not consider rationales supporting an ALJ's decision that are not invoked by the ALJ. *See Bagwell v. Barnhart*, 338 F. Supp. 2d 723, 735 (S.D. Tex. 2004). Thus, it is immaterial on these facts whether the evidence supports an unstated conclusion that Plaintiff's migraines would not limit her basic work activities beyond the RFC determined by the ALJ.

In conclusion, the Court finds a lack of substantial evidence to support the ALJ's decision not to include Plaintiff's allegations of migraine headaches in the step 2 determination of severe impairments. The case must therefore be remanded. Because the ALJ erred at an early stage of the proceedings, and the step 2 error necessarily impacts the remaining steps of the sequential disability determination process, the Court does not reach the remaining issues.

### III. CONCLUSION

Plaintiff's *Motion for Summary Judgment* (docket #14) should be **GRANTED**, *Commissioner's Motion for Summary Judgment* (docket #19) should be **DENIED**, and the decision of the Commissioner should be **REVERSED** and the case **REMANDED** for reconsideration.

On remand, the ALJ must, as part of his step 2 analysis, determine whether Plaintiff's migraine headaches constitute a severe impairment within the meaning set forth by the Fifth Circuit in *Stone v. Heckler*, 752 F.2d at 1101. If the ALJ determines her impairments are severe, the ALJ should proceed through the sequential steps of the disability determination process.

**SO RECOMMENDED** on this 30th day of June, 2009.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE